1

2

3

4

5

6

7

8

9                      IN THE UNITED STATES DISTRICT COURT

10                         FOR THE DISTRICT OF OREGON

11   DONALD CRAWFORD,                    )
                                         )
12                   Plaintiff,          )
                                         )        No.  CV-07-1606-HU
13        v.                             )
                                         )
14   MICHAEL J. ASTRUE,                  )
     Commissioner of Social             )        FINDINGS & RECOMMENDATION
15   Security,                           )
                                         )
16                   Defendant.          )
     ────────────────────────────────────)

17

18   Merrill Schneider
     SCHNEIDER LAW OFFICES
19   14415 SE Stark Street
     Portland, Oregon 97233-2153

20        Attorney for Plaintiff

21   Karin J. Immergut
     UNITED STATES ATTORNEY
22   District of Oregon
     Britannia I. Hobbs
23   ASSISTANT UNITED STATES ATTORNEY
     1000 S.W. Third Avenue, Suite 600
24   Portland, Oregon 97204-2902

25   / / /

26   / / /

27   / / /

28   / / /

1 - FINDINGS & RECOMMENDATION

L. Jamala Edwards
SPECIAL ASSISTANT UNITED STATES ATTORNEY
Office of the General Counsel
Social Security Administration
701 5th Avenue, Suite 2900, M/S 901
Seattle, Washington 98104-7075

    Attorneys for Defendant

HUBEL, Magistrate Judge:

    Plaintiff Donald Crawford brings this action for judicial review of the Commissioner's final decision to deny disability insurance benefits (DIB) and supplemental security income (SSI). This Court has jurisdiction under 42 U.S.C. § 405(g). I recommend that the Commissioner's decision be affirmed.

PROCEDURAL BACKGROUND

    Plaintiff applied for DIB and SSI on December 12, 2003, alleging an onset date of May 31, 2002. Tr. 74-78. His applications were denied initially and on reconsideration. Tr. 46-49, 50-54.

    On November 9, 2006, plaintiff, represented by counsel, appeared for a hearing before an Administrative Law Judge (ALJ). Tr. 271-300. On March 2, 2007, the ALJ found plaintiff not disabled. Tr. 11-25 The Appeals Council denied plaintiff's request for review of the ALJ's decision. Tr. 5-8.

FACTUAL BACKGROUND

I. Medical Evidence

    The earliest medical records appear to be from May 2000. Tr. 213-14. One is entitled Legacy Health System (LHS) "Ambulatory Care Summary Sheet," and though it bears an imprinted date of January 26, 2000, the only thing written on it is a diagnosis of asthma dated May 22, 2000. Tr. 213. The other record from this

2 - FINDINGS & RECOMMENDATION

time period is entitled "LHS Ambulatory Care Permanent Medication Record." Tr. 214. It also bears an imprinted date of January 26, 2000, but no date appears next to an entry which reads "albuterol[1] MDI Bid & Prn." *Id.* A subsequent entry on this form shows prescriptions of Advair Diskus[2] and trazodone[3] were given in September 2002. *Id.*

On May 10, 2002, plaintiff was seen by Dr. Douglas Beers, M.D., at the Legacy Emanuel "LCE" Clinic. Tr. 205-06. Plaintiff's chief complaint is listed as "Disability Paper." Tr. 205. He indicated that he needed refills of his asthma medications. *Id.* His peak flow was 750 on May 10, 2002, although he reported peak flows of less than 200 since August of 2001. *Id.* His chart was unavailable. *Id.* He was assessed as having asthma, and given samples of three medications: Flovent[4], albuterol, and Serevent[5]. Tr. 206.

On September 13, 2002, plaintiff was seen by Dr. Katherine Bensching, M.D., at the same Legacy LCE Clinic. Tr. 207-08. This time the chief complaint was listed as follow up for asthma and right hip pain. *Id.* Plaintiff complained of being unable to sleep

---

[1] A bronchodilator which relaxes muscles in the airways and increases air flow to the lungs. www.drugs.com

[2] An oral inhaler used to control asthma. www.drugs.com

[3] An anti-depressant medication sometimes used to treat sleeplessness. www.drugs.com

[4] A steroid medication used to prevent asthma attacks. www.drugs.com

[5] A bronchodilator used to prevent asthma attacks. www.drugs.com

3 - FINDINGS & RECOMMENDATION

more than three or four hours each night because of stressors in life keeping him awake, and right hip pain that started two days before he was seen which he thought was from sleeping "funny" on it.  Id.  He was assessed as having trochanteric bursitis and received a lidocaine injection and a recommendation to take non-steroidal anti-inflammatory medications.  Tr. 208.  The sleep issues were thought to be situational, and he was given trazodone as needed.  Id.

On October 10, 2002, plaintiff underwent a consultative examination by Dr. Jeff Buehler, M.D.  Tr. 168-71.  Although there were no prior medical records available for Dr. Buehler's review, plaintiff reported that he had arthroscopic knee surgery in 1993, with a partial meniscectomy performed on his left knee.  Tr. 168. He complained of experiencing trouble with popping, swelling, and the knee giving away on him since the surgery.  Id.  He stated that he could not really walk because of the swelling, which was exacerbated by walking too far.  Id.  He reported that he elevated the knee in the evening and occasionally took over the counter anti-inflammatory and pain medications.  Id.

Plaintiff also told Dr. Buehler that he had a life-long history of asthma.  Id.  He had never been hospitalized, but had been to the emergency room six or seven times in the past year. Id. Since an incident in which he was exposed to aerosolized grain when plaintiff was a longshoreman, he had been using a steroid spray and albuterol.  Id.  At the time he was examined by Dr. Buehler, plaintiff was using a "disc-type medication with an aerosolized mechanism of delivery[.]"  Tr. 168-69.  Plaintiff reported that his asthma was so bad at times that he could not make

4 - FINDINGS & RECOMMENDATION

1  it more than one block because of shortness of breath.  Tr. 169.

2  He also reported that he had worsening seasonal allergies and that

3  during rainy weather, he had more difficulty with his breathing.

4  Id.

5      Plaintiff reported that he lived alone, was able to cook for

6  himself, and do minor yard work.  Id.  He kept "his house in

7  working order," although it was not terribly clean.  Id.  He had a

8  friend who helped in the yard.  Id.  He ran his own auto-repair

9  business which he reported was going "okay."  Id.

10     On physical examination, Dr. Buehler noted that plaintiff was

11  in no acute distress, was mildly overweight, was not short of

12  breath, and was able to walk in and out of the exam room under his

13  own power, as well as get up and down off the table, take off his

14  pants, and take off his shoes.  Id.

15     Dr. Buehler noted that the left knee was obviously enlarged

16  with lateral meniscal joint line tenderness.  Tr. 170.  There was

17  no ligamentous laxity or palpable effusion and no tenderness on the

18  medial aspect of the left knee.  Id.  Strength was intact

19  throughout the lower extremities at the hips, knees, and ankles,

20  with flexion and extension being 5/5.  Id.

21     Dr. Buehler diagnosed plaintiff with likely osteoarthritis of

22  the left knee, secondary to meniscal surgery in the past, with an

23  effusion at present and lateral joint line tenderness.  Tr. 171.

24  He also diagnosed plaintiff as having asthma, by history, which he

25  noted was fairly severe and uncontrolled given his recurrent use of

26  the emergency room.  Id.  He noted that the asthma was going to be

27  further worked up with pulmonary function testing the following

28  week.  Id.

5 - FINDINGS & RECOMMENDATION

1    Dr. Buehler gave plaintiff the following physical capacities
2    assessment in his narrative report: (1) plaintiff would be able to
3    stand for two to six hours; (2) he could sit throughout the day;
4    (3) he was able to lift or carry between ten and twenty pounds,
5    with anything heavier possibly exacerbating his knee pain and
6    arthritis; (4) he was unable to walk extensive distances because of
7    his asthma and his knee pain; and (5) he was prohibited from more
8    than occasional prolonged bending, stooping, or crouching. Id.

9    Plaintiff had pulmonary function tests performed on October
10   14, 2002. Tr. 184-87. However, there is no contemporaneous report
11   from a provider interpreting the test results.

12   On December 10, 2002, plaintiff was seen by Dr. Evan
13   Soderstrom for an upper respiratory infection and poor sleep. Tr.
14   203. For his asthma, plaintiff reported using albuterol three to
15   four times per day, despite also increasing his Advair. Id. He
16   was not wheezing at the time, however. Id. Dr. Soderstrom's
17   assessment was that plaintiff had good peak flows and that
18   plaintiff was using more albuterol than necessary. Tr. 204.

19   On December 13, 2002, Disability Determination Services (DDS)
20   physician Dr. Charles Spray, M.D., completed a residual physical
21   capacities assessment for plaintiff. Tr. 172-77. He concluded
22   that plaintiff could occasionally lift or carry twenty pounds,
23   could frequently lift or carry ten pounds, could stand or walk
24   about six hours in an eight-hour workday, could sit about six hours
25   in an eight-hour workday, and had an unlimited ability to push and
26   pull. Tr. 173. Dr. Spray further assessed plaintiff with the
27   ability to frequently balance, and the ability to occasionally
28   climb ramps, stairs, ladders, ropes, scaffolds, and to occasionally

6 - FINDINGS & RECOMMENDATION

stoop, kneel, crouch, and crawl.  Tr. 174.  He assessed no visual, communicative, or environmental limitations.  Tr. 175.

On August 18, 2003, plaintiff missed his third appointment with Dr. Soderstrom.  Tr. 198.  Dr. Soderstrom reviewed plaintiff's chart due to multiple missed appointments.  Id.  He noted that plaintiff's phone number, address, and old emergency contact had been disconnected or moved.  Id.  He attempted to contact plaintiff without success and indicated he would allow plaintiff one more missed appointment but then would disenroll him, presumably as an Oregon Health Plan patient.  Tr. 198-99.

On December 16, 2003, plaintiff missed another appointment with Dr. Soderstrom.  Tr. 199-200.  Dr. Soderstrom reviewed plaintiff's chart on December 18, 2003, and attempted to call plaintiff to no avail.  Tr. 199.  He recommended disenrolling plaintiff because he had missed four appointments in one year.  Id.

On February 11, 2004, plaintiff was seen by Dr. Rajvir S. Jhooty, M.D. to establish care.  Tr. 195.  The chart note suggests that while the physician is different, the care was still associated with the LHS Emanuel Clinic.  Id.; see also Tr. 3 (listing records from Dr. Soderstrom and others as from Emanuel Internal Medicine).  Plaintiff explained that he had been in trouble with the law and was "locked up."  Tr. 195.  He discussed his asthma which was maintained on albuterol and Advair.  Tr. 196. He was told to return in four to eight weeks for follow-up.  Id.

Plaintiff saw Dr. Jhooty again on April 5, 2004.  Tr. 194, 197.  He complained about carpeting in his apartment.  Tr. 194. Dr. Jhooty recommended changing apartments or removing the carpet.

7 - FINDINGS & RECOMMENDATION

Tr. 197.   Dr. Jhooty added Singulair[6] to plaintiff's current medication regimen.   Id.

Plaintiff had another set of pulmonary function studies performed on May 11, 2004.  Tr. 181-83.  Although there is no interpretation of those studies on that date, on June 1, 2004, Dr. Jhooty noted that plaintiff's asthma symptoms had improved using albuterol, Advair, and Singulair and that his peak flows were better.  Tr. 190.  Dr. Jhooty noted that plaintiff's asthma was stable and he should continue with his current medications.  Tr. 191.

Plaintiff also complained of right flank pain, occurring over the previous two months.  Tr. 190.  There was no radiating pain and no urinary symptoms.  Id.  In his assessment, Dr. Jhooty noted that plaintiff had back pain which was intermittent and very mild, and probably musculoskeletal.  Tr. 191.  He questioned if there were a kidney or prostate problem and recommended that plaintiff have various blood tests performed.  Id.  He also noted a complaint of right leg numbness which apparently resolved with movement.  Id. No further recommendations were made regarding these complaints. Id.

On May 11, 2004, plaintiff was examined by DDS physician Dr. Lowan Stewart.  Tr. 178-80.  Dr. Stewart noted plaintiff's asthma condition and plaintiff's report of going to the emergency room once every five years.  Tr. 178.  Plaintiff reported to Dr. Stewart that he was taking albuterol and Advair daily, as well as

---

[6]  Used for the prevention and long-term treatment of asthma.   www.drugs.com

8 - FINDINGS & RECOMMENDATION

Claritin[7].  Id.  Plaintiff told Dr. Stewart that he could walk about a block without shortness of breath.  Id.

Plaintiff also complained of leg pain, remarking that his knee occasionally "goes out."  Id.  He indicated that the knee felt worse with bending, although he stated he was able to climb stairs and he took no pain medication for the problem.  Id.

Plaintiff told Dr. Stewart that he was able to take care of himself with cooking, cleaning, and normal housework, with occasional help from his niece.  Tr. 178-79.  He can dress himself and wash without difficulty.  Tr. 1799.

Dr. Stewart's general findings included some notable crepitus in plaintiff's left knee upon flexion, with mild left joint line tenderness and no pain with valgus or varus stress.  Tr. 180. There was no effusion or warmth noted.  Id.  Dr. Stewart opined that plaintiff could stand and walk six hours in an eight-hour day, limited by his knee pain.  Id.  He further opined that plaintiff should be able to sit without restrictions.  Id.  He indicated plaintiff should be able to carry twenty pounds frequently and fifty pounds occasionally, again limited by his left knee pain. Id.  He found no postural limitations with the exception of significant pain with squatting.  Id.  He indicated that plaintiff should not crawl on his knees.  Id.  No manipulative, visual, communicative, or environmental limitations were justified.  Id.

On July 20, 2004, DDS physician Scott Pritchard, D.O., completed a physical residual functional capacities assessment of

---

[7] Used to relieve symptoms of seasonal allergies. www.drugs.com

9 - FINDINGS & RECOMMENDATION

plaintiff.  Tr. 215-22.  Dr. Pritchard concluded that plaintiff could occasionally lift fifty pounds, frequently lift ten to twenty pounds, stand or walk about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday.  Tr. 216.  Dr. Pritchard further found that he could not operate foot controls with his left leg.  Id.

Dr. Pritchard indicated that plaintiff could occasionally or never (both boxes are checked) climb ramps, stairs, ladders, ropes, or scaffolds.  Tr. 217.  He could occasionally balance and kneel, frequently stoop, but never crouch or crawl.  Id.  He also concluded that plaintiff needed to avoid concentrated exposure to extreme cold and to hazards from "machinery, heights, etc.," and needed to avoid even moderate exposure to fumes, odors, dusts, gases, and poor ventilation.  Tr. 219.  Finally, Dr. Pritchard indicated that plaintiff's exertional capacity was restricted to light because of his asthma, obesity, and chronic knee condition. Tr. 216.

From December 14, 2004, to November 17, 2006, plaintiff was treated by several physicians at the LHS Emanuel Internal Medicine Clinic.  Tr. 223-62.  He was primarily seen by Dr. Dawnrenee Cinocco, M.D., although he was occasionally seen by other practitioners.

On December 14, 2004, plaintiff was seen by Dr. Jhooty.  Tr. 255-56.  Plaintiff told Dr. Jhooty that his pulmonary function had been much better than in the past, with recent peak flows measuring close to 400 or above, rather than in the 300s.  Tr. 255.  He continued to use albuterol, Advair, and Singulair.  Id.  Plaintiff reported that he was able to continue with his daily activities,

uninhibited by his breathing difficulties.  Id.  Plaintiff also
reported recent rectal bleeding and fatigue, but no weight loss.
Id.

Dr. Jhooty noted that plaintiff's asthma/reactive airway
disease was being treated with an adequate regimen of medications.
Tr. 256.  Plaintiff refused a rectal exam in the clinic, but agreed
to a gastrointestinal evaluation and colonoscopy, as needed.  Id.

Plaintiff was next seen on March 9, 2005, by Dr. Benjamin
Gmelch, M.D.  Tr. 253-54.  Plaintiff reported that his asthma was
no better, but no worse, than usual.  Tr. 253.  He never followed
up with the gastroenterology referral, but he complained of
occasional bloody stools.  Id.  Dr. Gmelch noted that plaintiff's
asthma was fairly well-controlled with his current medications,
which would be refilled.  Tr. 254.  He was again referred to the
gastrointestinal clinic.  Id.

Dr. Gmelch saw plaintiff again on March 25, 2005.  Tr. 251-52.
Plaintiff complained of difficulty breathing during nice weather
with a lot of pollen in the air.  Tr. 251.  This resulted in an
increase in his use of albuterol to three to five times per day,
from two to three times per day.  Id.  He also had a nonproductive
cough.  Id.  Dr. Gmelch refilled his albuterol and Advair, and gave
him samples of Clarinex[8].  Id.  He noted that plaintiff should
continue to use Nasonex for seasonal allergies.  Id.  Dr. Gmelch
also noted plaintiff's appointment with gastroenterology the
following week.  Id.

---

[8]  An antihistamine used to treat allergy symptoms.
www.drugs.com

11 - FINDINGS & RECOMMENDATION

On April 12, 2005, plaintiff saw Dr. Jhooty.  Tr. 249-50. Plaintiff reported that his allergic rhinitis symptoms had been well-controlled with the Clarinex.  Tr. 249.  He reported having an "active lifestyle" with walking recently.  Id.  Although Dr. Jhooty noted that plaintiff's reactive airway disease was significant, he also noted that it was adequately controlled and improving on his current medication regimen of Advair, albuterol, and Singulair. Id.

Dr. Jhooty also reported that plaintiff's allergic rhinitis was stable and well controlled on the Clarinex.  Id.  Plaintiff referred to ongoing mild rectal bleeding, which Dr. Jhooty felt would be addressed by gastroenterology, which, apparently, plaintiff had yet to visit.  Id.

Dr. Jacob Jones, M.D. saw plaintiff on June 15, 2005, at which time plaintiff reported that he had been doing fairly well, and had been able to participate in "general activities."  Tr. 247. Plaintiff reported some daily shortness of breath that worsened with exposure to hot weather or known environmental allergens.  Id. He had been using his albuterol more often than prescribed, up to eight or ten puffs per day.  Id.  As a result of his using more than the prescribed dose of albuterol, along with plaintiff's complaint that he still felt short of breath, Dr. Jones prescribed a trial dose of Combivent[9] inhaler four times per day, in order to reduce the frequency of plaintiff's use of the albuterol.  Tr. 248. Dr. Jones also noted that once the worst of the allergy season was

---

[9]  Used to relax muscles in airways and increase air flow to lungs when more than one bronchodilator is needed.  www.drugs.com

over, in late spring and early summer, plaintiff might then be able to decrease his albuterol use.  Tr. 248.

On August 2, 2005, plaintiff reviewed the proper use of the inhaler with a pharmacist.  Tr. 245-46.  On August 24, 2005, plaintiff was seen by Dr. Cinocco.  Tr. 243-44.  Plaintiff complained of a cough, and reported that he was using his "rescue inhaler" one or two times per day, and only one puff each time, compared with his prior use of two puffs, four to five times each day.  Tr. 243.  He also reported that he was sleeping through the night without being awakened by shortness of breath.  Id.

Dr. Cinocco noted that plaintiff reported that his asthma was much improved after proper instruction of the inhaler by the pharmacist.  Tr. 244.  He also had purchased a new vacuum with an air purifier and HEPA filter.  Id.  He was to continue with his current regimen of Advair, albuterol, and Singulair.  Id.  Dr. Cinocco also discussed taking Clarinex to alleviate allergy symptoms.  Id.  Finally, she noted that plaintiff reported that since he had taken a stool softener, his rectal bleeding had decreased.  Id.  He was scheduled for a colonoscopy the following month.  Id.

On November 1, 2005, plaintiff was seen by Dr. Khoi Le, M.D. Tr. 241-42.  Plaintiff still had not had a colonoscopy, but he reported that his rectal bleeding had been resolving with "hydration therapy" and a laxative.  Tr. 241.  Plaintiff reported that his breathing had been "decent."  Id.  Dr. Le noted that plaintiff had good breath sounds, no wheezing, and was in no apparent distress.  Tr. 242.  He continued plaintiff on his medications.  Id.

1    Dr. Cinocco saw plaintiff again on December 13, 2005.  Tr.
2    239-40.  Plaintiff reported some shortness of breath, especially
3    with exertion, and complained of being tired.  Tr. 239.  He was,
4    apparently, not using the correct dosage of his Combivent inhaler
5    and Dr. Cinocco instructed him on the proper dosage.  Tr. 239-40.
6    In response to his statement that he had stopped taking Clarinex
7    because it was no longer covered by his insurance, Dr. Cinocco
8    encouraged him to purchase Claritin over the counter.  Tr. 240.
9    Finally, in response to his report that he had had two episodes of
10   rectal bleeding since August, she encouraged him to keep his
11   appointment with gastroenterology and reschedule his colonoscopy.
12   Id.

13       On December 23, 2005, Dr. Cinocco saw plaintiff for a problem
14   unrelated to his asthma.  Tr. 237-38.  At the time, however,
15   plaintiff reported that his asthma had been better that week.  Id.

16       Dr. Cinocco next saw plaintiff on March 10, 2006.  Tr. 235-36.
17   Plaintiff reported that his asthma was under much better control
18   than it had ever been, which plaintiff attributed to the fact that
19   he no longer had friends who smoked cigarettes and thus, he kept
20   himself in a smoke-free environment.  Tr. 235.  He reported that he
21   still had not been able to enjoy a lot of the activities he used to
22   enjoy, and he had lost motivation to do things he liked to do.  Id.
23   He reported that this began after he went to jail, and upon his
24   release from jail when he became homeless.  Id.

25       Dr. Cinocco reported that plaintiff was obese, had asthma, and
26   presented with complaints of anhedonia, lack of motivation, and
27   general feelings of hopelessness.  Tr. 236.  She indicated that his
28   current asthma regimen was working quite well for him.  Id.  She

14 - FINDINGS & RECOMMENDATION

encouraged him to lose weight.  Id.  In discussing his anhedonia
and decreased motivation, Dr. Cinocco assessed plaintiff as having
depression and started him on Lexapro[10].  Id.

On June 23, 2006, Dr. Cinocco noted that plaintiff reported
that he had been feeling a lot better with his asthma under much
better control as a result of taking his medications exactly as
prescribed. Tr. 233. As for his depression, plaintiff stated that
he felt much better and did "not want to go off the Lexapro ever."
Tr. 234.  Although it made him feel better, plaintiff still
suggested that he probably was just going to be "down in the dumps"
all the time.  Id.  Dr. Cinocco discussed counseling with him, and
plaintiff stated he was open to it if he could afford it.  Id.  She
intended to discuss it with him at his next visit and refer him to
Cascadia Behavioral Healthcare.  Id.

On July 28, 2006, plaintiff complained to Dr. Cinocco that his
asthma had been "acting up a little bit more than usual,"
especially when the weather was very hot.  Tr. 231.  He also
reported that he had been feeling lethargic with no initiative.
Id. Dr. Cinocco recommended that plaintiff stay with his current
medication regimen for his asthma, and to use a neti pot to help
clean his sinuses.  Tr. 232.

Plaintiff stated that he wanted to continue taking Lexapro.
Id. Dr. Cinocco discussed many options with plaintiff including
performing volunteer work.  Id.  She also referred him to Cascadia
for counseling.  Id.

On October 19, 2006, plaintiff saw Dr. Paula Muegge and

---

[10]  An anti-depressant medication.  www.drugs.com

15 - FINDINGS & RECOMMENDATION

reported that he had been out of his medications for approximately one and one-half months due to loss of medical coverage.  Tr. 230. He presented with symptoms of nasal congestion, headache, ear fullness, and dizziness.  Id.  Dr. Muegge assessed plaintiff as having sinusitis and prescribed a two-week course of antibiotics. Id.  She also provided samples of Singulair, after noting that he had enough Advair already.  Id.  His albuterol inhaler was also refilled.  Id.  Plaintiff noted that he had been out of Lexapro for over a month and noticed a slight difference in his mood.  Id.  Dr. Muegge provided samples of Lexapro at this visit.  Id.

On October 27, 2006, plaintiff saw Dr. Cinocco again.  Tr. 228.  Plaintiff reported that he had lost his medical insurance because of a new requirement that he provide a birth certificate which he had been unable to obtain.  Id.  He was working on getting one, but expressed concern about getting his health care paid for until he obtained a birth certificate.  Tr. 228-29.

Plaintiff reported that the Lexapro made him feel much better and during the time he was off of it, he became quite short-tempered and out of sorts.  Tr. 229.  Although plaintiff reported that he felt much better when he takes his medication, he still felt like he had no motivation and could not accomplish goals.  Tr. 229.  He denied suicidal ideation.  Id.

Dr. Cinocco stated that plaintiff's asthma was well-controlled on his current medications.  Id.  She further stated that his sinusitis was resolving.  Id.  He was advised to complete his course of antibiotics.  Id.

Dr. Cinocco assessed plaintiff as having "profound depression."  Id.  She noted his report that he felt better on the

16 - FINDINGS & RECOMMENDATION

Lexapro.  Id.  Plaintiff also reported to Dr. Cinocco that he had spoken with Cascadia but "that did not work out well for him."  Id. Plaintiff preferred to "come in to this clinic and work things through."  Id.  Dr. Cinocco stated that "[w]e will continue to do this as long as it is possible."  Id.

On November 8, 2006, plaintiff's attorney sent a letter and form to the Emanuel Internal Medicine Clinic to obtain information about plaintiff's limitations.  Tr. 223-27.  Dr. Cinocco completed the form on or about November 17, 2006.  Id.  She listed plaintiff's impairments as depression, asthma, obesity, severe allergy, folliculitis, bloody stools, and anxiety.  Tr. 223.

Dr. Cinocco indicated that plaintiff suffered from shortness of breath, chest tightness, wheezing, episodic acute asthma, fatigue, and coughing.  Tr. 224.  Acute asthma attacks were precipitated by upper respiratory infections, allergens, exercise, emotional upset/stress, irritants, and cold air/change in weather. Id.

As for his physical limitations, she opined that he could occasionally lift or carry ten pounds, frequently lift or carry less than ten pounds, stand or walk at least two hours in an eight-hour workday, and sit about six hours in an eight-hour workday. Tr. 224-25.  He had unlimited ability to push and pull, and could occasionally balance, stoop, kneel, crouch, or crawl.  Id.  She concluded that he could never climb.  Id.

Dr. Cinocco further indicated that plaintiff could frequently reach in all directions, including overhead, and could frequently handle, finger, and feel.  Tr. 225.  Dr. Cinocco stated that plaintiff had to avoid all exposure to extreme cold and extreme

17 - FINDINGS & RECOMMENDATION

heat, as well as fumes, odors, dusts, gases, and poor ventilation. Tr. 226. Plaintiff had to avoid frequent exposure to wetness and humidity. Tr. 226. He had no restrictions as to noise, vibration, or hazards. Id.

As for his mental disorders, Dr. Cinocco checked that plaintiff had "[r]ecurrent severe panic attacks manifested by sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week[,]" and that he had "[r]ecurrent obsessions or compulsions which are a source of marked distress[.]" Id. In her medical judgment, plaintiff was markedly limited in his concentration, persistence, and pace, and markedly limited in his social functioning. Id. Dr. Cinocco opined that plaintiff was moderately limited in his activities of daily living. Tr. 227.

Dr. Cinocco stated that plaintiff had experienced repeated episodes of decompensation, each of extended duration, and that she would expect him to miss more than two days a month from even a simple, routine, and sedentary job. Id. As evidence in support of her conclusion, she stated that plaintiff's "depression [and] anxiety sometimes cause him to flee. Per his reports of leaving [and] being gone for days on end but not knowing where or why he was going." Id. She concluded that his symptoms would likely increase if he were placed in a competitive work environment and that based on her medical expertise and treatment of plaintiff, the severity of his condition could have or did exist with the same severity on or before December 31, 2005. Id.

II. Plaintiff's Testimony

Plaintiff testified at the hearing that his breathing is the

18 - FINDINGS & RECOMMENDATION

main problem preventing him from working, along with his right leg
and hip, and problems with standing and walking.   Tr. 280.
Plaintiff described experiencing shortness of breath and chest pain
as a result of his asthma.  Tr. 281.  He experienced shortness of
breath or wheezing even when sitting still.  Tr. 283.  He stated
that he had to go to the doctor two to three times per month on
unscheduled visits, to receive treatment.  Tr. 281.  He explained
that he goes in and receives treatment because his inhaler does not
work.  Id.

     Plaintiff complained that the asthma medication he takes makes
him tired and sluggish.  Tr. 281-82.  He goes to bed about 8:30 or
9:00 p.m., but often wakes up in the middle of the night because of
breathing problems and the need to use medication to control those
problems.  Tr. 282.  It takes him one to two hours to fall asleep
after that.  Id.  He gets up at about 9:00 or 10:00 a.m., and is
"all drugged out" and asleep by 12:00 p.m., at which time he sleeps
for another two to three hours.  Tr. 282-83.  At the time of the
hearing, he no longer did any activities.  Tr. 283.

     As for his knee, he testified that he experiences sharp
throbbing pain if he stays on it too long.  Tr. 283.  After five
minutes, he has to sit down and elevate it.  Tr. 284.  Sometimes he
ices it as well.  Tr. 285.  He takes Advil for the pain.  Tr. 284.
On a scale of one to ten, with ten being the worst pain, he
described his average pain as an eight and one-half.  Id.

     Plaintiff also testified that pain in his right hip keeps him
from working.  Tr. 286.  He gets an aching pain in his right hip
and sometimes his leg goes numb.  Id.  He has had this problem
since 1980.  Id.  Although he was able to work despite the pain for

19 - FINDINGS & RECOMMENDATION

1  several years, it has gotten worse, especially in the four years
2  before the hearing.   Id.   Plaintiff described the hip pain as an
3  ache, with it a nine on a one to ten scale.   Tr. 287.   Sitting
4  increases the pain.   Id.   He can sit for five to eight minutes
5  before it starts to bother him and then he has to find a different
6  position.   Id.

7       Plaintiff explained that he cooks sometimes, depending on how
8  he feels.  Tr. 289.  Greasy smells, the smell of food, and raw meat
9  prevent him from cooking more.   Id.   He does his own laundry
10 sometimes, but the detergent can bother his breathing.   Id.
11 Sometimes his niece does it for him, and sometimes he gets help
12 from a thirteen-year old child he babysits.   Id.   This child
13 sometimes does errands for plaintiff as well.   Tr. 290.

14      Plaintiff has problems going to the store and walking around
15 because of his legs.   Id.   He also experiences breathing problems
16 in certain parts of the store such as the coffee and detergent
17 aisles.   Id.   He is bothered by colognes and perfumes.   Id.

18      Plaintiff noted that his physician had increased his dosage of
19 Lexapro from ten to twenty milligrams.  Tr. 291.  His symptoms of
20 depression are that he wants to be active, but cannot.   Id.   In
21 plaintiff's opinion, the twenty milligrams was not effective.   Tr.
22 292.  He does nothing for fun.   Id.

23 III.  Vocational Expert Testimony

24      Vocational Expert (VE) Katherine Heatherly testified at the
25 hearing.   Tr. 293.   She described plaintiff's past relevant
26 shipyard laborer work as heavy and unskilled.   Tr. 294.   She
27 indicated that his auto repair work would be medium and skilled,
28 although she was unclear if it was fully skilled given that

20 - FINDINGS & RECOMMENDATION

plaintiff was self-employed, and the job was not preceded by a more independent assessment and clear establishment of his skills. Id.

The ALJ posed the following hypothetical to the VE: a fifty-four year old worker with the same educational and vocational background as plaintiff who can lift fifty pounds occasionally and twenty pounds frequently, with no work requiring foot-operated controls with the left lower extremity. Tr. 296. Added to this were the requirements that the worker not be required to use any ropes, ladders, or scaffolds, or be required to crouch or crawl. Id. The worker should only occasionally engage in any balancing, climbing, or kneeling. Id. Sitting, standing, and walking were each limited to six hours total in a workday. Id. The worker was not to be exposed to any concentrated cold, any concentrated dust, fumes, odors, or gases, and not be exposed to any hazardous situations such as moving equipment, machinery, or unprotected heights. Id. Finally, the worker should not be required to work in an environment requiring quick or sudden movements of the legs and lower body. Id.

In response, the VE opined that such a worker could not perform any of plaintiff's past relevant work. Id. However, she identified light and unskilled jobs of cashiering and small products assembly as jobs such a worker could perform, and an optical goods assembly position which she characterized as sedentary and unskilled. Tr. 197. The VE further testified that even if the weight restrictions were changed to ten to twenty pounds, the worker could perform the jobs she identified. Tr. 298.

In response to questions by plaintiff's counsel, the VE testified that if elevation of the legs was required as plaintiff

21 - FINDINGS & RECOMMENDATION

testified, on a schedule more frequent than could be accommodated with normal work breaks, the worker could not perform the identified jobs. Tr. 299. Finally, the VE confirmed that if the worker would miss two or more days per month of work due to breathing problems, fatigue, or depression, the worker could not perform the identified jobs. Id.

THE ALJ'S DECISION

The ALJ first concluded that plaintiff had not engaged in substantial gainful activity since May 31, 2002. Tr. 16. Next, he concluded that collectively, plaintiff's impairments of asthma, osteoarthritis of the left knee, and depression, were severe. Id. However, he further found that plaintiff's impairments, considered singly or in combination, did not equal or meet a listed impairment. Tr. 20.

The ALJ next determined plaintiff's residual functional capacity (RFC). Tr. 20-23. The ALJ found that plaintiff's testimony regarding his impairments, symptomology, and resulting functional limitations, was not entirely credible. Id. He also gave no weight to Dr. Cinocco's November 2006 residual functional capacity assessment. Id. He concluded that plaintiff could perform light work with postural and environmental non-exertional limitations. Id.

Based on this RFC, the ALJ concluded that plaintiff could not perform his past relevant work, but that he could perform the jobs of small products assembly, cashier-II, and optical goods assembly. Tr. 24. According, the ALJ concluded that plaintiff was not disabled. Id.

/ / /

22 - FINDINGS & RECOMMENDATION

STANDARD OF REVIEW & SEQUENTIAL EVALUATION

A claimant is disabled if unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).  Disability claims are evaluated according to a five-step procedure.  <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1395 (9th Cir. 1991).  The claimant bears the burden of proving disability.  <u>Swenson v. Sullivan</u>, 876 F.2d 683, 687 (9th Cir. 1989).  First, the Commissioner determines whether a claimant is engaged in "substantial gainful activity."  If so, the claimant is not disabled.  <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b).  In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments."  <u>Yuckert</u>, 482 U.S. at 140-41; <u>see</u> 20 C.F.R. §§ 404.1520(c), 416.920(c).  If not, the claimant is not disabled.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity."  <u>Yuckert</u>, 482 U.S. at 141; <u>see</u> 20 C.F.R. §§ 404.1520(d), 416.920(d).  If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four.  <u>Yuckert</u>, 482 U.S. at 141.

In step four the Commissioner determines whether the claimant can still perform "past relevant work."  20 C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant can, he is not disabled.  If he cannot perform past relevant work, the burden shifts to the Commissioner.

1    In step five, the Commissioner must establish that the claimant can
2    perform other work.  <u>Yuckert</u>, 482 U.S. at 141-42; <u>see</u> 20 C.F.R. §§
3    404.1520(e) & (f), 416.920(e) & (f).  If the Commissioner meets its
4    burden and proves that the claimant is able to perform other work
5    which exists in the national economy, he is not disabled.    20
6    C.F.R. §§ 404.1566, 416.966.

7        The court may set aside the Commissioner's denial of benefits
8    only when the Commissioner's findings are based on legal error or
9    are not supported by substantial evidence in the record as a whole.
10   <u>Baxter</u>, 923 F.2d at 1394.  Substantial evidence means "more than a
11   mere scintilla," but "less than a preponderance."  <u>Id.</u>  It means
12   such relevant evidence as a reasonable mind might accept as
13   adequate to support a conclusion.  <u>Id.</u>

                                    DISCUSSION

15       Plaintiff contends that the ALJ erred by (1) improperly
16   rejecting Dr. Cinocco's opinion; (2) improperly discounting
17   plaintiff's depression; and (3) improperly rejecting plaintiff's
18   testimony as not credible.  I address the arguments in turn.
19   I.   Treating Physician's Opinion

20       The ALJ gave no weight to the opinions expressed by Dr.
21   Cinocco in her November 17, 2006 limitations assessment.  Tr. 22.
22   The ALJ first noted that her assessments were not consistent with
23   or supported by the medical evidence of record, "inclusive of her
24   own treatment notes and records[.]"  <u>Id.</u>  Next, he noted that under
25   Ninth Circuit precedent, a physician's brief opinion, consisting of
26   conclusions with little or no clinical findings to support the
27   conclusion, need not be accepted.  <u>Id.</u>  Finally, he noted that
28   "check off reports," conclusory statements, and physician opinions

24 - FINDINGS & RECOMMENDATION

1  of disability solicited by counsel containing no explanation of the

2  bases for the conclusions drawn, are disfavored.  Id.

3       In the Ninth Circuit,

4       [t]o reject an uncontradicted opinion of a treating or
         examining doctor, an ALJ must state clear and convincing
5        reasons that are supported by substantial evidence. . .
         . If a treating or examining doctor's opinion is
6        contradicted by another doctor's opinion, an ALJ may only
         reject it by providing specific and legitimate reasons
7        that are supported by substantial evidence.

8  Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005) (citation

9  omitted).

10      The ALJ may reject a treating physician's limitations

11  assessment when it is unsupported by the treating physician's notes

12  and observations.  Bayliss, 427 F.3d at 1216 (discrepancy between

13  treating physician's notes and recorded observations on the one

14  hand and assessment of the claimant's ability to stand and walk on

15  the other, was a clear and convincing reason to reject the

16  physician's opinion regarding standing and walking); Connett v.

17  Barnhart, 340 F.3d 871, 874-75 (9th Cir. 2003) (ALJ properly

18  rejected opinion of treating physician when opinion unsupported by

19  physician's own treatment notes).

20      A.  Assessment of Physical Limitations

21      As noted above, Dr. Cinocco's November 17, 2006 assessment of

22  plaintiff's physical limitations included occasionally lifting or

23  carrying ten pounds, frequently lifting or carrying less than ten

24  pounds, standing or walking at least two hours in an eight-hour

25  workday, and sitting about six hours in an eight-hour workday.  Tr.

26  224-25.  She also concluded that he had the unlimited ability to

27  push and pull, and could occasionally balance, stoop, kneel,

28  crouch, or crawl.  Id.  She indicated that he could never climb.

25 - FINDINGS & RECOMMENDATION

1  Id.

2      The medical record, including Dr. Cinocco's own chart notes,

3  supports the ALJ's rejection of Dr. Cinocco's physical limitations.

4  The first mention of any non-asthma physical ailment is a September

5  13, 2002 note of plaintiff's complaint of recent right hip pain.

6  Tr. 207-08.  He received a lidocaine injection and a recommendation

7  to take non-steroidal anti-inflammatory medications.  Id.  There is

8  no subsequent mention in any medical record of right hip pain.

9      The first mention of plaintiff's knee pain is on October 10,

10  2002, by examining physician Dr. Buehler.  Tr. 168.  Although he

11  complained of popping and swelling, and interference with walking

12  too far, he took only over the counter pain and anti-inflammatory

13  medications.  Id.  He also reported that at the time, he was able

14  to cook for himself, do minor yard work, keep his house "in working

15  order," and run his own auto-repair business.  Tr. 169.  He was

16  able to walk in and out of the exam room with no distress, and was

17  able to get himself up and down off the exam table.  Id.  He also

18  had intact strength throughout his lower extremities.  Tr. 170.

19      Based upon his examination, Dr. Buehler limited plaintiff's

20  ability to walk extensive distances, but thought he could stand for

21  two to six hours, sit throughout the day, and carry between ten and

22  twenty pounds.  Id.  Dr. Buehler prohibited plaintiff from more

23  than occasional prolonged bending, stooping, or crouching.  Id.

24      Dr. Soderstrom saw plaintiff in December 2002.  No mention was

25  made of any leg or knee problem.  Tr. 203-04.  Plaintiff then

26  missed four appointments with Dr. Soderstrom in 2003.

27      In 2004, plaintiff saw Dr. Jhooty several times.  At no time

28  did plaintiff mention leg or knee pain to Dr. Jhooty.  Tr. 195

26 - FINDINGS & RECOMMENDATION

(February 11, 2004); Tr. 194, 197 (April 5, 2004); Tr. 190-91 (June 1, 2004); Tr. 255-56 (December 14, 2004). Although plaintiff mentioned right flank pain at the June 1, 2004 visit with Dr. Jhooty, it was intermittent and very mild, and no further notes about it appear in the record. Plaintiff also mentioned right leg numbness at that visit, but indicated that it resolved with movement. Tr. 191. No recommendations were made at the time regarding that complaint and no further notes about it appear in the record.

During the time plaintiff was being treated by Dr. Jhooty, he was examined by Dr. Lowan Stewart who rendered a physical limitations assessment similar to Dr. Buehler's assessment. Dr. Stewart concluded that plaintiff's knee pain limited him to standing and walking six hours in an eight-hour day, with no restrictions on plaintiff's ability to sit. Tr. 180. He concluded plaintiff could frequently carry twenty ponds and could carry fifty pounds occasionally. Id.

The records from December 14, 2004, to October 27, 2006, when plaintiff was seen by several physicians at the Emanuel Clinic, but primarily by Dr. Cinocco, make no mention of any complaint of leg or knee pain to any provider. As the ALJ recognized, the medical records regarding any lower extremity problems, including Dr. Cinocco's own chart notes, fail to provide support for her conclusions regarding plaintiff's physical limitations.

As for plaintiff's asthma, and any physical limitations it might cause, the record consistently refers to plaintiff being stable, or improving, on his medication regimen, especially when he uses his medications properly. E.g., Tr. 191 (Dr. Jhooty reporting

27 - FINDINGS & RECOMMENDATION

on June 1, 2004, that plaintiff's symptoms had improved using albuterol, Advair, and Singulair, and that plaintiff's peak flows were better; further noting that plaintiff's asthma was stable and recommending he continue with his current medications); Tr. 255 (Dr. Jhooty reporting on December 14, 2004, that plaintiff's pulmonary function was much better); Tr. 253 (Dr. Gmelch noting that plaintiff's asthma was fairly well-controlled with his current medications; plaintiff reported that it was no better, but no worse, than usual); Tr. 249 (plaintiff reported to Dr. Jhooty that his recent flare-up of allergy symptoms had been well-controlled with Clarinex; Dr. Jhooty reporting that while plaintiff's reactive airway disease was significant, it was well-controlled and improving on his current medication regimen); Tr. 236 (Dr. Cinocco noting on March 10, 2006, that his current asthma regimen was working quite well for him); Tr. 229 (Dr. Cinocco reporting on October 27, 2006, that plaintiff's asthma was well-controlled with his current medications).

Moreover, on physical examination, he was repeatedly found to have little or no wheezing and little or no shortness of breath, e.g., Tr. 169 (October 10, 2002, Dr. Buehler noting plaintiff was not short of breath); Tr. 203 (Dr. Soderstrom reporting on December 10, 2002, that plaintiff was not wheezing at the time); Tr. 255 (Dr. Jhooty noting on December 14, 2004, that plaintiff had somewhat decreased air entry bilaterally, diffusely, somewhat prolonged expiratory phase, but no obvious wheezes, rales, or rhonchi); Tr. 253 (Dr. Gmelch noting on March 9, 2005, that plaintiff had mild apical, wheezes but good air movement throughout the lungs); Tr. 248 (Dr. Jones noting on June 15, 2005, that

28 - FINDINGS & RECOMMENDATION

plaintiff's lungs were clear to auscultation in all quadrants and that plaintiff was moving air well); Tr. 243 (Dr. Cinocco noting on August 24, 2005, that plaintiff had an increased expiratory phase, but no wheezes, rales, or rhonchi); Tr. 241 (Dr. Le noting on November 1, 2005, that plaintiff had good breath sounds and no wheezing);

Finally, plaintiff reported on several occasions that he was able to take care of himself and engage in activities. E.g., Tr. 178-79 (plaintiff stating to Dr. Stewart on May 11, 2004, that he was able to take care of himself with cooking, cleaning, and normal housework, with occasional help from niece); Tr. 255 (plaintiff stating to Dr. Jhooty on December 14, 2004, that he was able to continue with his daily activities, uninhibited by his shortness of breath); Tr. 249 (plaintiff stating to Dr. Jhooty on April 12, 2005, that he had an "active lifestyle" with walking recently); Tr. 247 (plaintiff stating to Dr. Jones on June 15, 2005, that he had been able to participate in "general activities"); Tr. 243 (plaintiff reported to Dr. Cinocco that his asthma was much improved after proper instruction on the inhaler by the pharmacist and he was now sleeping through the night without being awakened by shortness of breath).

The medical evidence, including Dr. Cinocco's own chart notes, does not support the physical limitations assessed by Dr. Cinocco. Accordingly, the ALJ's rejection of her assessment was not in error.

The ALJ also noted that Dr. Cinocco's November 17, 2006 opinions were brief and conclusory with little or no clinical findings to support them.  In response to the question on the form

29 - FINDINGS & RECOMMENDATION

submitted to her regarding what limitations or symptoms plaintiff suffers as a result of his impairments, she noted, generally, that he was unable to exert because of his severe asthma exacerbations. Tr. 224. She also noted, again generally, that his asthma decreases his stamina. Id. What is missing is any discussion of the specific limits on his exertion and stamina (as opposed to check off boxes indicating limits), and how she arrived at the check-off limits indicated in the assessment. Thus, in addition to there being no medical evidence support for Dr. Cinocco's assessment, the ALJ correctly noted that her assessment was brief and conclusory and for this reason, it was appropriately rejected. See Crane v. Shalala, 76 F.3d 251, 253 (9th Cir. 1996) (ALJ permissibly rejected evaluations when they contained no explanation of the bases for their conclusions); Young v. Heckler, 803 F.2d 963, 967-68 (9th Cir. 1986) (ALJ properly rejected physician's report which contained few clinical findings).

Finally, while Dr. Cinocco's assessment is more comprehensive than those which simply check that a patient is disabled, and there are a few open-ended questions to which she provided a short narrative response, the assessment is primarily a check-box form which courts have disfavored. E.g., Murray v. Heckler, 722 F.2d 499, 501 (9th Cir. 1983) (noting contrast between opinion expressed in form with check marks in boxes and opinion expressed in a detailed analysis, and expressing preference for the former over the latter).

The ALJ's rejection of Dr. Cinocco's November 17, 2006 assessment of plaintiff's physical limitations is supported by substantial evidence in the record and was not error.

30 - FINDINGS & RECOMMENDATION

B.   Mental Health Assessment and Limitations

Dr. Cinocco assessed plaintiff as having marked limitations in concentration, persistence, and pace, and marked limitations in social functioning, as well as moderate limitations in activities of daily living.   Tr. 226-27.   She further stated that he had experienced repeated episodes of decompensation, each of extended duration, and that he would miss more than two days per month from even a simple, routine, and sedentary job.   Tr. 227.   In her opinion, these limitations were supported by plaintiff's depression and anxiety.   Id.   Dr. Cinocco checked that plaintiff suffered from recurrent panic attacks and recurrent obsessions or compulsions. Tr. 226.   She also noted that his anxiety and depression cause him to flee for reasons plaintiff cannot articulate.   Tr. 227.

Dr.   Cinocco's   opinions   regarding   plaintiff's   mental functioning are completely unsupported by the medical evidence. There is no reference in any medical record of a problem with anxiety or panic attacks.   There is no reference to any issue with "fleeing." While Dr. Cinocco treated plaintiff for depression, the first notation of any depressive symptoms was in March 2006.   Tr. 235-36.   At that time, Dr. Cinocco prescribed Lexapro which, plaintiff reported in June 2006, made him feel "much better."   Tr. 233.

In July 2006, plaintiff reported that he had been feeling lethargic with no initiative, but he stated that he wanted to continue taking Lexapro. Tr. 231-32.   Plaintiff ran out of Lexapro for a time in the fall of 2006, reporting a slight difference in his mood without it, but he received samples of the medication at his October 19, 2006 visit with Dr. Muegge.   Tr. 230.   Shortly

thereafter, he told Dr. Cinocco that while he was off the Lexapro, he was short-tempered and out of sorts. Tr. 229. However, he consistently reported that while he still felt unmotivated to accomplish goals, the Lexapro made him feel much better. Tr. 229-30.

This is the extent of the medical evidence regarding any mental health issues for plaintiff. Dr. Cinocco's November 17, 2006 assessment of anxiety-related issues and marked limitations is completely unsupported and the ALJ properly rejected it for the reasons he stated.

II. Plaintiff's Depression

Plaintiff contends that the ALJ improperly discounted his depression. The ALJ discussed plaintiff's depression as part of the step two analysis determining whether plaintiff had any severe impairments. The ALJ noted that plaintiff had not pursued referrals to appropriate mental health programs and that he had only been prescribed Lexapro by his primary care physician, and only for the past year. Tr. 19. Nonetheless, the ALJ, expressly giving plaintiff every benefit of the doubt, deemed plaintiff's depression, in combination with his other alleged impairments of asthma and left knee pain, to be severe. Id.

The ALJ then continued his step two discussion, and noted that under listed impairment 12.04 for affective and depressive disorders, the medical evidence established that plaintiff suffered from a "medically determinable mental impairment which does not precisely satisfy the established diagnostic criteria," but which nonetheless presented "symptoms consistent with depressive disorder, not otherwise specified, mild-to-moderate, with features

32 - FINDINGS & RECOMMENDATION

of subjectively reported constant worrying." Id. (internal quotation omitted).

Based on the medical evidence in the record, the ALJ concluded that plaintiff's depression caused mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace. Id. The ALJ also found that plaintiff had suffered from no episodes of decompensation. Id. Accordingly, while the ALJ found plaintiff's depression, when considered in combination with plaintiff's asthma and left knee impairments, to be severe, he found no particular functional limitations as a result of plaintiff's depressive symptoms.

Plaintiff contends that the ALJ's bases for discounting plaintiff's depression were improper when the ALJ relied on plaintiff's failure to pursue a referral to an appropriate mental health provider and plaintiff having been prescribed only Lexapro by his primary care provider. I do not read the ALJ's decision in the same manner as plaintiff and thus, I reject plaintiff's argument.

The ALJ began his discussion of plaintiff's depression by noting that plaintiff had not pursued a referral to a mental health care program and had only been prescribed Lexapro by his primary care physician and only for one year. While the ALJ perhaps slightly overstated the facts by describing plaintiff's failure to obtain treatment at Cascadia as a non-pursuit of the mental health referral, the ALJ, in the previous paragraph of his opinion, recited the facts directly from the record and thus, it is clear the ALJ was aware that plaintiff had gone to Cascadia, but reported

33 - FINDINGS & RECOMMENDATION

to Dr. Cinocco that it "did not work out well." Plaintiff contends that the ALJ's discussion shows that he discounted plaintiff's depression for failure to seek appropriate treatment which plaintiff argues is unsupported by the relevant law.

I reject plaintiff's interpretation. The point of the ALJ's reference in this regard is not that plaintiff failed to obtain any treatment for his depression, but that for some vague, unexplained reason in the record, plaintiff chose not to obtain treatment at an agency specializing in mental health care, thus demonstrating a less severe impairment than one requiring psychiatric supervision or ongoing counseling, neither of which Dr. Cinocco provided. See 20 C.F.R. 404.1527(d)(5) (opinion of specialist accorded more weight).

More importantly, immediately following the ALJ's reference about plaintiff's decision to forego treatment at Cascadia, the ALJ nonetheless gave plaintiff the benefit of the doubt and found his depression, in combination with his asthma and knee impairments, to be severe. Thus, the ALJ did not discount plaintiff's depression because plaintiff did not obtain services at Cascadia.

This is also true of the argument plaintiff makes that the ALJ improperly discounted plaintiff's depression because he obtained treatment from Dr. Cinocco. Plaintiff notes that the Ninth Circuit recognizes that general practitioners are qualified to provide opinions regarding the limitations arising from the mental impairments of their patients. Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987) (recognizing that primary care physicians identify and treat the majority of Americans' psychiatric disorders).

34 - FINDINGS & RECOMMENDATION

1    I agree with plaintiff that an ALJ may not discount an opinion
2    regarding limitations caused by a mental impairment, solely because
3    it is rendered by a family or general practitioner rather than a
4    psychiatrist.    Here, however, while the ALJ noted plaintiff's
5    treatment with a primary care provider, he still found plaintiff's
6    depression, in combination with the other impairments, to be
7    severe.    Ultimately, he did not discount plaintiff's depression
8    because he obtained treatment from a general practitioner.

9    After making his determination about the severity of this
10   impairment, the ALJ then assessed the functional limitations
11   resulting from the impairment based on the "the medical evidence of
12   record." Tr. 19.  As discussed in the prior section, the medical
13   evidence of record offers no support to Dr. Cinocco's assessments.
14   Rather, the ALJ's determinations in regard to plaintiff's
15   depression are supported by substantial evidence in the record.
16   III.  Plaintiff's Credibility

17   Plaintiff argues that the ALJ improperly rejected his
18   subjective testimony.   The ALJ noted that despite the alleged
19   frequency, nature, and severity of his asthma and left leg pain,
20   plaintiff acknowledged in his testimony that from 1995 through
21   2003, he performed tune-ups on cars, brake jobs, and even motor
22   replacement work in his auto-repair business.   Tr. 21.

23   The ALJ next noted that while plaintiff did not describe his
24   activities of daily living in any detail at the hearing, his
25   testimony regarding pain and medication side-effects suggested that
26   his activities of daily living were very limited.   Id.   The ALJ
27   concluded that plaintiff's statement concerning the intensity,
28   persistence, and limiting effects of his symptoms were not entirely

credible.    As support, the ALJ first noted that there was no evidence in the record of right hip or leg pain, no evidence of plaintiff ever complaining to his physician that his inhalers made him sleepy, and no evidence that any doctor medically recommended that he elevate his legs.    Id.

The ALJ further found inconsistencies between plaintiff's testimony suggesting quite limited activities of daily living and other evidence in the record.    Tr. 22.    The ALJ cited to records showing that plaintiff was independent in self-care, money management, and most housecleaning, cooking, and shopping.    Id.

The ALJ noted that plaintiff had never complained of a sleepiness side-effect to his medication.    Id.    The ALJ further noted that drowsiness is not a recognized side-effect from inhaler therapy.    Id.    Finally, he noted that plaintiff's alleged need to elevate his legs two to three times per day was not supported anywhere in the medical evidence with no treating or examining physician ever telling plaintiff to elevate his legs for any reason.    Id.

The ALJ is responsible for determining credibility.    Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).    Once a claimant shows an underlying impairment and a causal relationship between the impairment and some level of symptoms, clear and convincing reasons are needed to reject a claimant's testimony if there is no evidence of malingering.    Smolen v. Chater, 80 F.3d 1273, 1281-82 (9th Cir. 1996).

When determining the credibility of a plaintiff's complaints of pain, the ALJ may properly consider several factors, including the plaintiff's daily activities, inconsistencies in testimony,

36 - FINDINGS & RECOMMENDATION

1   effectiveness or adverse side effects of any pain medication, and

2   relevant character evidence. Orteza v. Shalala, 50 F.3d 748, 750

3   (9th Cir. 1995). The ALJ may also consider the ability to perform

4   household chores and the unexplained absence of treatment for

5   excessive pain when determining whether a claimant's complaints of

6   pain are exaggerated. Id. Although the ALJ may not rely solely on

7   a lack of objective medical evidence to find a claimant not

8   credible, it may be considered among other factors in the

9   credibility analysis. Burch v. Barnhart, 400 F.3d 676, 681 (9th

10  Cir. 2005).

11       Plaintiff testified that his level of hip pain was nine out of

12  ten. Tr. 287. However, there is only one treatment note regarding

13  a hip pain complaint, and it was from 2002 when plaintiff reported

14  two days of hip pain after sleeping "funny" on it. Tr. 207. As

15  previously noted, this was treated with a lidocaine injection and

16  there are no subsequent notes referring to any continued complaints

17  of hip pain. The failure to report symptoms or limitations to

18  treatment providers is a legitimate consideration in determining

19  the credibility of a claimant's complaints. Greger v. Barnhart,

20  464 F.3d 968, 972 (9th Cir. 2006). The ALJ's rejection of

21  plaintiff's testimony regarding limitations on the use of his right

22  leg caused by hip pain is supported by substantial evidence in the

23  record.

24       Plaintiff also testified that he took frequent naps during the

25  day because his asthma medications made him drowsy. Tr. 21, 28-83.

26  However, plaintiff never complained to his treatment providers of

27  this negative side effect. Plaintiff also testified that his

28  inhaler did not work and he experienced shortness of breath while

37 - FINDINGS & RECOMMENDATION

walking.   Tr. 21, 282.   As the prior discussions above note, however, the medical evidence consistently refers to his condition being stable or improving.   Moreover, just a few weeks before this testimony, Dr. Cinocco noted that his asthma was well controlled by his medications.   Tr. 229.   And, as noted above, the record indicates that plaintiff participated in many, if not most, activities of daily living.   Tr. 247 (participating in daily/general activities and walk up flight of stairs without difficulty); Tr. 249 (reported having active lifestyle and walking).   The ALJ's rejection of plaintiff's testimony regarding his medication side effects and limits allegedly caused by his asthma is supported by substantial evidence in the record.

Finally, plaintiff testified that he needed to elevate his legs for two to three hours, three times per day, to relieve pain, and that he could stand for only five minutes.   Tr. 21, 283-85.   As the ALJ noted, however, no practitioner recommended this treatment. Additionally, none of plaintiff's treating source medical records make any reference to complaints of knee pain.   While one examining physician thought a cane might relieve some of the pressure over his knee and reduce arthritic symptoms, there is no indication that plaintiff used a cane for symptom relief at any time.

While plaintiff testified that his knee pain was eight and one-half out of ten, the record shows he used only over-the-counter medication.   Use of over-the-counter pain medication is evidence undermining a claimant's testimony that pain testimony is not credible.   See Parra v. Astrue, 481 F.3d 742, 750-51 (9th Cir. 2007) (over-the-counter pain medication was evidence of "conservative treatment" sufficient to discount a claimant's

testimony regarding severity of an impairment), <u>cert. denied</u>, 128
S. Ct. 1068 (2008).  The ALJ's rejection of plaintiff's testimony
regarding limitations caused by his knee pain and the need to
elevate his knee is supported by substantial evidence in the
record.

CONCLUSION

I recommend that the Secretary's decision be affirmed.

SCHEDULING ORDER

The above Findings and Recommendation will be referred to a
United States District Judge for review.  Objections, if any, are
due December 29, 2008.  If no objections are filed, review of the
Findings and Recommendation will go under advisement on that date.

If objections are filed, a response to the objections is due
January 12, 2009, and the review of the Findings and Recommendation
will go under advisement on that date.

IT IS SO ORDERED.

Dated this  11th  day of December     , 2008.




 /s/ Dennis James Hubel
Dennis James Hubel
United States Magistrate Judge

39 - FINDINGS & RECOMMENDATION